KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900
William O. Purcell (WP 5001)
Laryssa C. Kachmar (LK 4492)

Attorneys for Plaintiff
Fuji Photo Film U.S.A., Inc.

05 CIV. 7869

FILED
SEP 0 9 2(
USDC WP SDNY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUJI PHOTO FILM U.S.A., INC., Plaintiff, | |
| -against- | 05 Civ. No. ______ |
| | **COMPLAINT** ROBINSON |
| SCOTT F. McNULTY, LORI S. McNULTY, a/k/a LORI STRAUB, MICHAEL C. CONNELL, FRANK FRANZE, DWAIN K. TAYLOR, ADK AMERICA, INC., AWOL, ESSENTIAL COMMUNICATIONS & INK LLC, REVOLUTIONARY GRAPHICS, INC. and THE WINDWOOD GROUP LLC, Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, Fuji Photo Film U.S.A., Inc. ("Fuji"), by and through its attorneys, Kirkpatrick & Lockhart Nicholson Graham LLP, for its Complaint alleges as follows:

**THE PARTIES**

1. Plaintiff Fuji is a corporation organized under the laws of New York with its principal place of business located at 200 Summit Lake Drive, Valhalla, New York with offices and distribution centers throughout the United States. Fuji is in the business of, among others, distributing film, cameras, audio and video media and computer products.

2. Defendant Scott F. McNulty ("McNulty") is a resident of the State of Connecticut. From on or about September 14, 1992 through on or about February 27, 2004, McNulty was an employee of Fuji. While at Fuji, McNulty worked in the Computer Products Division ("CPD") and held the following positions: Product Manager (November 1992 – 1995); Group Product Manager (1996 – 1997); Marketing Manager (1998 – October 2000); Director of Marketing (November 2000 – June 2002); and Director of Branding (July 2002 – 2003). On or about January 2, 2004, the CPD merged with the Magnetic Markets Division ("MMD") to form the Recording Media Division ("RMD"). McNulty was the Director of New Product Development for the RMD from in or about January 2004 to in or about February 2004. On or about February 27, 2004, McNulty resigned from Fuji. While in these various positions, McNulty was responsible for the CPD's advertising and marketing, which included running the CPD's rebate promotional programs.

3. Defendant Lori S. McNulty ("L. McNulty"), a/k/a Lori Straub ("Straub"), is a resident of the State of Connecticut. L. McNulty is the wife of McNulty, and her maiden name is Lori Straub. L. McNulty is the owner of defendant AWOL. Straub is the owner and president of Revolutionary Graphics, Inc. ("Revolutionary Graphics").

4. Defendant Michael C. Connell ("Connell") is a resident of the State of New Jersey. Connell is the vice president of Essential Communications & Ink LLC ("ECI").

5. Defendant Frank Franze ("Franze") is a resident of the State of Connecticut. Franze is the vice president of Revolutionary Graphics and president and CEO of The Windwood Group LLC ("Windwood").

6. Defendant Dwain K. Taylor ("Taylor") is a resident of the State of New York. Taylor is the president of ADK America, Inc. ("ADK").

7. Defendant ADK, a subsidiary of a Japanese entity, Asatsu Inc., is a corporation organized under the laws of California and has an office located at 515 West 20th Street, New York, New York. At all times relevant to this Complaint, ADK provided advertising and marketing services to Fuji.

8. Defendant AWOL is a business entity organized under the laws of Connecticut.

9. Defendant ECI is a limited liability company organized under the laws of New Jersey with its principal place of business at 55 Madison Avenue, Morristown, New Jersey. At all times relevant to this Complaint, ECI purportedly provided, among other things, rebate processing, consulting and web conversion services to Fuji.

10. Defendant Revolutionary Graphics is a corporation organized under the laws of Delaware with its principal place of business at Harbor Square, 700 Canal Street, Stamford, Connecticut.

11. Defendant Windwood is a limited liability company organized under the laws of Connecticut with its principal place of business at 363 West Road, New Canaan, Connecticut. Between on or about April 2003 and on or about March 2004, Windwood processed rebates for Fuji.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a).

## NATURE OF THE CASE

14. This is an action arising out of a series of fraudulent schemes orchestrated by McNulty, with the specific intent to defraud Fuji, involving certain outside vendors hired by McNulty for Fuji's CPD to process rebates and to perform certain advertising, marketing, promotional and website design and maintenance services. These vendors include defendants ADK, AWOL, ECI, Revolutionary Graphics and Windwood (the "Vendor Defendants").

15. At McNulty's direction, the Vendor Defendants submitted numerous invoices, directly and indirectly, to Fuji for purported services, the descriptions of which were oftentimes provided by McNulty.

16. However, on many occasions, such invoices that were submitted, directly or indirectly, to Fuji by defendants ADK, AWOL, ECI and Revolutionary Graphics were, upon information and belief, for services which were never performed.

17. In addition, Fuji was substantially overcharged for rebate processing services by defendants ECI and Windwood, who fraudulently misrepresented to Fuji that their respective rates for processing rebates were at or below market price.

18. In addition, upon information and belief, one or more of the Vendor Defendants was making payments to McNulty in return for McNulty providing Fuji business to such vendors, all in breach of McNulty's fiduciary duties to Fuji.

19. As a result of the fraudulent schemes of McNulty and the other defendants, Fuji has suffered at least $12,500,000 in damages, before trebling and not including punitive damages. The full extent of the fraud, and the full extent of Fuji's damages, has yet to be determined.

## BACKGROUND FACTS

20. As alleged in paragraph 2 above, McNulty joined Fuji on or about September 14, 1992. McNulty worked in Fuji's CPD and was responsible for procuring services from, among others, vendors that provided advertising, marketing, rebate processing and website design and maintenance services. Pursuant to these responsibilities, McNulty retained the services of ADK, AWOL, ECI and Windwood during the course of his employment with Fuji. He also indirectly retained the services of Revolutionary Graphics and ECI through ADK.

21. On or about May 3, 1995, McNulty signed Fuji's Employee Acknowledgement and Certification Compliance with Law Program (the "Acknowledgment"), indicating that McNulty read and understood Fuji's Standards of Business Conduct and Compliance with Law Program (the "Standards"), dated March 1, 1995.

22. The Standards provide, in relevant part, the following: "In dealings with current or potential customers, suppliers, contractors or competitors, employees should at all times act in the best interests of the Company to the exclusion of any personal advantage which the employee might gain." The Standards further enumerate clear scenarios of what Fuji deems to be conflicts of interest, including the following:

> "(1.) The acquiring by an employee or any family member of a substantial interest in any outside entity which does or seeks to do business with or competes with the Company.
>
> (2.) Serving as an officer, director, partner or consultant or any other important role in any of the above mentioned entities."

## FICTITIOUS BILLINGS

### I. Business Transactions Through McNulty's Wife

23. In implementing the various fraudulent schemes described herein, upon information and belief, McNulty funneled Fuji monies to himself through his wife's business entities.

24. McNulty, in breach of his fiduciary duties to Fuji and his signed Acknowledgment, directed certain Fuji business operations through his wife's companies, AWOL and later indirectly through Revolutionary Graphics.

#### A. AWOL

25. AWOL is owned and operated by L. McNulty. Its post office box address is the same post office box address as that of McNulty.

26. From in or about March 1995 to in or about June 1998, AWOL submitted invoices for services to Fuji. Upon information and belief, such invoices were sent to Fuji via mail and were false in that many of the services set forth in the invoices were never performed.

27. Between in or about March 1995 and in or about June 1998, pursuant to such invoices, Fuji paid AWOL a total of $455,011. Upon information and belief, such payments were by check delivered by mail. A Schedule of invoices from AWOL to Fuji, containing the false representations of services, and payments by Fuji to AWOL of such invoices is attached hereto as Exhibit A.

28. By causing Fuji to make such payments to AWOL, McNulty intentionally and knowingly breached his fiduciary obligations to Fuji by causing Fuji to do business with an entity in which a family member had a controlling interest.

**B. Revolutionary Graphics**

29. On or about June 22, 1998, the same date that AWOL submitted its last invoice to Fuji, Revolutionary Graphics was incorporated by L. McNulty, a/k/a Straub. Shortly thereafter, in or about 1999, Revolutionary Graphics began billing Fuji indirectly through ADK.

30. The business operations of Revolutionary Graphics are unknown. However, its owner and president is L. McNulty, a/k/a Straub, who is McNulty's wife. The vice president of Revolutionary Graphics is Franze, a friend and neighbor of McNulty.

31. ADK, Fuji's advertising company, was used by McNulty to bill Fuji for services purportedly performed for Fuji by other companies. At McNulty's direction, defendants Revolutionary Graphics and ECI submitted to ADK invoices for services purportedly performed for Fuji. ADK, in turn, billed Fuji for these same amounts without indicating the actual vendor. In virtually all instances, ADK added its own standard 17 percent commission on the amounts billed in these invoices.

32. From in or about 1999 to in or about 2003, numerous Revolutionary Graphics invoices were submitted to ADK at McNulty's direction, upon information and belief, via facsimile. Upon information and belief, no services were performed by Revolutionary Graphics for Fuji as falsely represented in these invoices. Upon information and belief, ADK made payment to Revolutionary Graphics pursuant to these invoices by mail or by wire.

33. At McNulty's direction, ADK, in turn, billed Fuji for the amounts it paid to Revolutionary Graphics and submitted its invoices to Fuji via the mail. McNulty instructed ADK as to the amounts and descriptions to be billed to Fuji in ADK's invoices, but, upon information and belief, no work was actually performed for Fuji as falsely represented in these ADK invoices. At all relevant times, in virtually all instances, Fuji mailed checks to ADK in payment of its invoices.

34. Upon information and belief, at the time ADK received and paid such invoices from Revolutionary Graphics, and at the time ADK billed Fuji for such amounts, ADK was aware that no work had actually been performed by Revolutionary Graphics for Fuji in connection with these invoices.

35. From in or about 1999 to in or about 2003, payments were made by Fuji indirectly to Revolutionary Graphics through ADK in the amount of $6,777,611. However, the actual amount paid by Fuji to ADK is approximately 17 percent higher because ADK applied its standard 17 percent mark-up in passing these bills along to Fuji. A Schedule of certain invoices submitted by Revolutionary Graphics to ADK and by ADK to Fuji in 2002 and 2003, all containing such false representations of services, is attached hereto as Exhibit B.

36. A Schedule of certain ADK checks and wire transfers to Revolutionary Graphics in payment of Revolutionary Graphics invoices in 2002 and 2003 is attached hereto as Exhibit C.

37. By causing Fuji to make such payments to Revolutionary Graphics via ADK, McNulty intentionally and knowingly breached his fiduciary obligations to Fuji by causing Fuji to do business with an entity in which a family member had a controlling interest.

## II. Other Billings through ADK

### A. ECI

38. ECI is owned and operated by Connell. Upon information and belief, Connell is a friend and long time acquaintance of McNulty.

39. From in or about 1999 to in or about 2003, numerous ECI invoices were submitted to ADK at McNulty's direction, upon information and belief, through the mail. Upon information and belief, no services were performed by ECI for Fuji as falsely represented in these invoices. Upon information and belief, ADK remitted payment to ECI pursuant to these invoices via the mail or wire transfer.

40. At McNulty's direction, ADK, in turn, billed Fuji for the amounts it paid to ECI and submitted its invoices to Fuji via the mail. McNulty instructed ADK as to the amounts and descriptions to be billed to Fuji in ADK's invoices, but, upon information and belief, no work was actually performed for Fuji as falsely represented in these ADK invoices. In virtually all instances, ADK added its own standard 17 percent commission on the work billed in these invoices. At all relevant times, in virtually all instances, Fuji mailed checks to ADK in payment of its invoices.

41. Upon information and belief, at the time ADK received and paid ECI's invoices, and at the time ADK billed Fuji for such amounts, ADK was aware that no work had actually been performed by ECI for Fuji in connection with these invoices.

42. From in or about 1999 to in or about 2003, payments were made by Fuji indirectly to ECI through ADK in the amount of $3,305,293. However, the actual amount paid by Fuji to ADK is approximately 17 percent higher because ADK applied its standard 17 percent

mark-up in passing these bills along to Fuji. A Schedule of certain invoices submitted by ECI to ADK and by ADK to Fuji in 2002 and 2003, all containing such false representations of services, is attached hereto as Exhibit D.

43. A Schedule of certain ADK checks and wire transfers to ECI in payment of ECI invoices in 2002 and 2003 is attached hereto as Exhibit E.

### B. McNulty's Sporting and Entertainment Expenses

44. From at least in or about 2002 to in or about 2003, at McNulty's direction, ADK submitted a series of invoices to Fuji which purport to be for work done for Fuji, but which actually included amounts paid by ADK, at McNulty's direction, for the purchase of tickets to various sporting and entertainment events. A Schedule of some such fraudulent invoices submitted by ADK to Fuji is attached hereto as Exhibit F.

45. At McNulty's request, ADK purchased tickets to various events, oftentimes from ticket brokers at prices significantly higher than the market price.

46. Upon information and belief, ADK subsequently billed Fuji, via the mail, for such purchases. However, the descriptions on these invoices did not mention and concealed the ticket purchases.

47. From at least in or about 2002 to in or about 2003, Fuji paid ADK, also via the mail, at least $400,000 pursuant to such fraudulent invoices, some portion of which was for McNulty's entertainment expenses.

## III. Fraudulent Invoices from ECI

48. Upon information and belief, ECI was and is a small company in the business of brokering printing jobs.

49. In or about 1997, ECI was purportedly hired by Fuji, at McNulty's direction, to perform a variety of services, including preparing advertising and promotional materials, performing website maintenance and performing electronic conversions of printed materials. Fuji did not enter into any written agreement with ECI pursuant to which such services were to be performed.

50. From at least in or about December 2002 to in or about September 2003, ECI submitted, via the mail, to Fuji approximately 74 invoices, totaling $2,142,665, for services which, upon information and belief, were never performed. Fuji paid such invoices, which falsely represented that services had been performed for Fuji, also via the mail. Upon information and belief, some portion of such payments by Fuji to ECI, in excess of $1,000, was paid by ECI to McNulty without Fuji's knowledge for the purpose of influencing McNulty's conduct in relation to Fuji's affairs. A Schedule of such fraudulent invoices submitted by ECI to Fuji is attached hereto as Exhibit G.

## THE REBATE SCHEMES

### I. ECI as Fuji's Rebate Program Administrator

51. From in or about December 2000 to in or about October 2003, defendants McNulty, Connell and ECI participated in a fraudulent scheme in order to deceive Fuji into believing that it was receiving rebate fulfillment services from Connell and ECI at or below a fair market rate. As a result of this scheme, Fuji was charged by ECI for rebate processing in the amount of approximately $1,800,000.

52. On or about December 2000, ECI purportedly began processing rebates for Fuji's CPD. ECI purportedly processed rebates for Fuji until on or about March 2003, but submitted invoices to Fuji for rebate processing through on or about October 2003.

53. Upon information and belief, ECI was and is a small print broker rather than a rebate fulfillment house, and ECI did not have any prior experience in rebate fulfillment nor has ECI processed rebates for any other customers since Fuji.

54. Although Fuji's customers were apparently paid by ECI for their rebates, ECI overcharged Fuji in administration fees for processing per rebate in comparison to other legitimate rebate fulfillment houses. ECI's charges for rebate processing averaged approximately $1.46 per rebate. In or about approximately the same time period, other legitimate rebate fulfillment houses charged between $0.38 and $0.52 per rebate for processing.

55. McNulty, Connell and ECI defrauded Fuji in that they led Fuji to believe that Fuji was receiving rebate processing services at or below a fair market rate. In fact, Fuji was receiving such services from a company, which, upon information and belief, had no rebate processing experience, was owned and operated by a friend of McNulty, and was charging Fuji for rebate processing at a rate far in excess of a fair market rate.

56. As a result of this scheme, Fuji paid to ECI approximately $1,800,000 in administration and processing fees, some portion of which, upon information and belief, was due to ECI's inflated rates, and Fuji has been damaged by the inflated amount. Upon information and belief, Connell and ECI paid some portion of the funds received from Fuji, in excess of $1,000, to McNulty without Fuji's knowledge and for the purpose of influencing McNulty's conduct in relation to Fuji's affairs.

## II. Windwood as Fuji's Rebate Program Administrator

57. From in or about April 2003 to in or about March 2004, defendants McNulty, Franze and Windwood participated in a fraudulent scheme in order to deceive Fuji into believing that it was receiving rebate fulfillment services from Franze and Windwood at or below a fair market rate. As a result of this scheme, Fuji was charged for rebate processing in the amount of approximately $1,600,000.

58. On or about April 2003, Windwood took over processing Fuji's rebates from ECI.

59. Windwood was formed and commenced doing business in April 2003. Windwood is owned and operated by Franze, McNulty's friend and neighbor. Upon information and belief, Franze was unemployed at the time that McNulty hired Franze and Windwood to process rebates for Fuji's CPD.

60. Like ECI, upon information and belief, Windwood is a one-man operation with no prior experience in rebate fulfillment, and, at all relevant times, Windwood had never processed rebates for any company other than Fuji.

61. Pursuant to the Windwood scheme, McNulty and Franze created a rebate redemption system which purportedly required the involvement of several additional companies.

62. Although Fuji's customers were apparently paid by Windwood for their rebates, Windwood also charged Fuji excessive administration fees for processing per rebate in comparison to other legitimate rebate fulfillment houses. Windwood's charges for rebate processing averaged approximately $7.50 per rebate. In or about approximately the same time

period, other legitimate rebate fulfillment houses charged between $0.38 and $0.52 per rebate for processing.

63. McNulty, Franze and Windwood defrauded Fuji in that they led Fuji to believe that Fuji was receiving such services at or below a fair market rate. In fact, Fuji was receiving such services from a company, which, upon information and belief, had no rebate processing experience, was owned and operated by a friend of McNulty, and was charging Fuji for rebate processing at a rate far in excess of a fair market rate.

64. As a result of this scheme, Fuji paid to Windwood approximately $1,600,000 in administration and processing fees, some portion of which, upon information and belief, was due to Windwood's inflated rates, and Fuji has been damaged by the inflated amount. Upon information and belief, Franze and Windwood paid some portion of the funds received from Fuji, in excess of $1,000, to McNulty without Fuji's knowledge and for the purpose of influencing McNulty's conduct in relation to Fuji's affairs.

**FRAUDULENT CONCEALMENT**

65. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 64 above as if set forth in full herein.

66. Defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI and Revolutionary Graphics fraudulently concealed their actions alleged herein from Fuji.

67. Defendants McNulty, L. McNulty and AWOL fraudulently concealed their actions from Fuji by failing to disclose that AWOL was L. McNulty's company and by issuing

invoices to Fuji which falsely represented that certain services were performed for Fuji, all as specifically alleged in paragraphs 25 through 28 above.

68. Defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, ECI and Revolutionary Graphics fraudulently concealed their actions from Fuji by engaging in a scheme whereby ADK issued false invoices to Fuji on behalf of Revolutionary Graphics and ECI which invoices concealed the involvement of Revolutionary Graphics and ECI and concealed the fact that the services billed in such invoices were never performed, all as specifically alleged in paragraphs 29 through 43 above.

69. Such concealment prevented Fuji from discovering its claims herein, in that Fuji was unable to learn the true identity of the individuals and entities with which it was doing business, and Fuji was led to believe that services were being performed as reflected in the invoices it received and paid, all as specifically set forth in paragraphs 25 through 43 above.

70. Fuji has exhibited due diligence in pursuing discovery of its claims alleged herein. On approximately January 2, 2004, the CPD, McNulty's division, and the MMD were merged to form the RMD. In connection with this merger, the Fuji employees assigned to take over McNulty's responsibilities began to inquire of McNulty and others about the CPD's relationship with the Vendor Defendants. McNulty and others, including some of the Vendor Defendants, either refused to respond or gave false and/or misleading responses to Fuji's inquiries. McNulty resigned from Fuji on approximately February 27, 2004. Thereafter, Fuji diligently investigated McNulty's activities in the CPD and his relationships with the Vendor Defendants.

**FIRST CLAIM AGAINST ALL DEFENDANTS**

**RICO: § 1962(c)**

71. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 70 above as if set forth in full herein. This claim is brought against all defendants, each of whom constitutes a "person" as defined in 18 U.S.C. § 1961(3).

72. At the times alleged in this Complaint, a division of Fuji, the CPD, constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

73. At the times alleged in this Complaint, the CPD, and defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood were an association-in-fact that constituted an "enterprise" as defined in 18 U.S.C. § 1961(4).

74. Each of the above enterprises was, at all relevant times, engaged in activities that affected interstate commerce.

75. Defendant McNulty was employed by the enterprises specified in paragraphs 72 and 73 above. Defendants L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood were associated with the enterprises specified in paragraphs 72 and 73 above.

76. Defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood conducted and participated, directly and indirectly, in the conduct of the affairs of the enterprises alleged in paragraphs 72 and 73 above through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), involving mail and wire fraud, and commercial bribery under New York Penal Law, and for the

unlawful purpose of defrauding Fuji. Specifically, defendant McNulty conducted the affairs of the enterprises in a manner which caused the enterprises to hire defendants L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood to provide purported services and submit fraudulent invoices for such services to Fuji. These defendants, in turn, participated in the conduct of the affairs of the enterprises in that these defendants participated in the enterprises' advertising, marketing, rebate program and website maintenance operations. The defendants operated the enterprises in a manner which resulted in falsely billing or overcharging Fuji.

77. In connection with the conduct alleged in paragraph 76 above, defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood on more than two occasions intentionally and knowingly used or caused to be used mail delivered by the United States Postal Service and wire transmissions in furtherance of the schemes and artifices used to defraud Fuji. This conduct constituted mail fraud pursuant to 18 U.S.C. § 1341, wire fraud pursuant to 18 U.S.C. § 1343 and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). The specified mailings are described in paragraphs 26, 27, 32, 33, 35, 36, 39, 40, 42, 43, 44, 46, 47 and 50 above. The specified wire transmissions are described in paragraphs 32, 35, 36, 39 and 43 above.

78. In connection with the conduct alleged in paragraph 76 above, defendants McNulty, Connell, Franze, Taylor, ADK, ECI and Windwood on more than two occasions engaged in Commercial Bribery in the First Degree and Commercial Bribe Receiving in the First Degree under the New York Penal Law, §§ 180.03 and 180.08, in that defendants Connell, Franze, Taylor, ADK, ECI and Windwood paid to McNulty, and McNulty received,

in excess of $1,000, all without Fuji's knowledge and for the purpose of influencing McNulty's conduct in relation to Fuji's affairs. This conduct constituted racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).

79. The acts, practices and conduct alleged in paragraphs 76, 77 and 78 above involve numerous acts of racketeering activity occurring between 1995 and 2004 and constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

80. The racketeering acts alleged in paragraphs 76, 77 and 78 above are interrelated in that the common goal and purpose was to benefit McNulty and the other defendants through a series of repeated frauds carried out by related participants against a single victim, Fuji, and employ a similar method of commission: at McNulty's direction, the defendants submitted fictitious and/or inflated invoices for purported services and misrepresented to Fuji that such services were either performed or were provided at or below market rates. The racketeering activity of the defendants was not confined to isolated events, but rather amounted to repeated and continuous racketeering activity over a period of at least nine years.

81. The defendants have directly and indirectly conducted and participated in the affairs of the enterprises through the pattern of racketeering activity described above in violation of 18 U.S.C. § 1962(c). By reason of this violation, Fuji has been injured in its business and/or property and has been damaged in an amount in excess of $12,500,000, before trebling and not including punitive damages.

82. Pursuant to 18 U.S.C. § 1964(c), defendants are jointly and severally liable to Fuji for the amount of its ultimate loss, trebled, plus interest, costs and attorneys' fees.

## SECOND CLAIM AGAINST ALL DEFENDANTS

## RICO: § 1962(d)

83. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 82 above as if set forth in full herein. This claim is brought against all defendants, each of whom constitutes a "person" as defined in 18 U.S.C. § 1961(3).

84. Defendants conspired to commit the violation of 18 U.S.C. § 1962(c) described in paragraphs 71 through 82 above, each of which is repeated and realleged herein.

85. At defendant McNulty's direction, defendants L. McNulty, a/k/a Straub, Connell, Franze and Taylor agreed to cause their business entities, defendants ADK, AWOL, ECI, Revolutionary Graphics and Windwood, and did cause their business entities to commit two or more of the racketeering acts alleged in paragraphs 1 through 82 above, as part of the above-described conspiracy.

86. In connection with the conduct alleged in paragraph 76 above, defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood on more than two occasions intentionally and knowingly used or caused to be used mail delivered by the United States Postal Service and wire transmissions in furtherance of the schemes and artifices used to defraud Fuji. This conduct constituted mail fraud pursuant to 18 U.S.C. § 1341, wire fraud pursuant to 18 U.S.C. § 1343 and racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B). The specified mailings are described in paragraphs 26, 27, 32, 33, 35, 36, 39, 40, 42, 43, 44, 46, 47 and 50 above. The specified wire transmissions are described in paragraphs 32, 35, 36, 39 and 43 above.

87. In connection with the conduct alleged in paragraph 76 above, defendants McNulty, Connell, Franze, Taylor, ADK, ECI and Windwood on more than two occasions engaged in Commercial Bribery in the First Degree and Commercial Bribe Receiving in the First Degree under the New York Penal Law, §§ 180.03 and 180.08, in that defendants Connell, Franze, Taylor, ADK, ECI and Windwood paid to McNulty, and McNulty received, in excess of $1,000, all without Fuji's knowledge and for the purpose of influencing McNulty's conduct in relation to Fuji's affairs. This conduct constituted racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B).

88. By reason of defendants' conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d), Fuji has been injured in its business and/or property and has been damaged in an amount in excess of $12,500,000, before trebling and not including punitive damages.

89. Pursuant to 18 U.S.C. § 1964(c), defendants are jointly and severally liable to Fuji for the amount of its ultimate loss, trebled, plus interest, costs and attorneys' fees.

**THIRD CLAIM AGAINST McNULTY, L. McNULTY AND AWOL**

**FRAUD**

90. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 89 above as if set forth in full herein. This claim is brought against defendants McNulty, L. McNulty and AWOL.

91. Between on or about March 1995 and June 1998, AWOL and L. McNulty, with the knowledge and participation of McNulty, falsely and fraudulently and with the intent to

defraud Fuji represented to Fuji that certain services, including preparation of advertising and promotional material, were performed.

92. AWOL and L. McNulty, with the knowledge and participation of McNulty, knowingly and falsely represented that such services were performed by submitting fictitious invoices to Fuji as specified in paragraph 27 above. AWOL and L. McNulty submitted these invoices with the intent to defraud and deceive Fuji so as to induce Fuji to make payments to AWOL.

93. Fuji reasonably relied upon such material misrepresentations and was thereby induced to remit payment to AWOL for these purported services.

94. Fuji had no knowledge of the falsity of McNulty's, L. McNulty's and AWOL's misrepresentations.

95. McNulty's, L. McNulty's and AWOL's conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

96. By reason of the foregoing, Fuji suffered actual damages in the amount of approximately $455,011, together with interest, costs and attorneys' fees.

**FOURTH CLAIM AGAINST McNULTY, L. McNULTY, a/k/a STRAUB, CONNELL, FRANZE, TAYLOR, ADK, ECI and REVOLUTIONARY GRAPHICS**

**FRAUD**

97. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 96 above as if set forth in full herein. This claim is brought against defendants McNulty, L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, ECI and Revolutionary Graphics.

98. From in or about 1999 to in or about 2003, Revolutionary Graphics and ECI submitted invoices to ADK for services which were never performed. During that same time period, ADK, at McNulty's direction, and with the knowledge and participation of Revolutionary Graphics and ECI, falsely and fraudulently and with the intent to defraud Fuji represented to Fuji that certain services, including services for which ECI and Revolutionary Graphics billed ADK, were performed by ADK.

99. ADK, with the knowledge and participation of Revolutionary Graphics and ECI, knowingly and falsely represented that such services were performed by submitting fictitious invoices to Fuji which were artificially inflated by 17 percent. Upon information and belief, ADK knew that ECI and Revolutionary Graphics did not perform the services for which they billed ADK, and ADK did not perform the services for which it billed Fuji. ADK submitted these invoices with the intent to defraud and deceive Fuji so as to induce Fuji to make payments to ADK directly and ECI and Revolutionary Graphics indirectly.

100. Fuji reasonably relied upon such material misrepresentations and was thereby induced to remit payment to ADK for these purported services.

101. Fuji had no knowledge of the falsity of McNulty's, L. McNulty's, a/k/a Straub, Connell's, Franze's, Taylor's, ADK's, ECI's and Revolutionary Graphics' misrepresentations.

102. McNulty's, L. McNulty's, a/k/a Straub, Connell's, Franze's, Taylor's, ADK's, ECI's and Revolutionary Graphics' conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

103. By reason of the foregoing, Fuji suffered actual damages in the amount of at least $12,500,000, together with interest, costs and attorneys' fees.

## FIFTH CLAIM AGAINST McNULTY, TAYLOR AND ADK

## FRAUD

104. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 103 above as if set forth in full herein. This claim is brought against defendants McNulty, Taylor and ADK.

105. From at least in or about 2002 to in or about 2003, ADK, at McNulty's direction, submitted invoices to Fuji which purported to be for work done for Fuji, but portions of which actually covered the costs of tickets to sporting and entertainment events purchased by ADK for McNulty. During that same time period, ADK falsely and fraudulently and with the intent to defraud Fuji represented to Fuji such work as described in those invoices was performed by ADK.

106. ADK, with the knowledge and participation of McNulty, knowingly and falsely represented that such services were performed by submitting those invoices to Fuji. ADK knew that the total amounts of those invoices did not reflect the amount of work, if any, performed, but rather incorporated costs for tickets to various sporting and entertainment events. ADK submitted these invoices to Fuji with the intent to defraud and deceive Fuji so as to induce Fuji to make payments to ADK to cover the costs of tickets purchased for McNulty by ADK.

107. Fuji reasonably relied upon such material misrepresentations and was thereby induced to remit payment to ADK.

108. Fuji had no knowledge of the falsity of McNulty's, Taylor's and ADK's misrepresentations.

109. McNulty's, Taylor's and ADK's conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

110. By reason of the foregoing, Fuji suffered actual damages in the amount of at least $400,000, together with interest, costs and attorneys' fees.

## SIXTH CLAIM AGAINST McNULTY, CONNELL AND ECI

## FRAUD

111. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 110 above as if set forth in full herein. This claim is brought against defendants McNulty, Connell and ECI.

112. Between on or about December 2002 and September 2003, ECI, with the knowledge and participation of McNulty, falsely and fraudulently and with the intent to defraud Fuji represented to Fuji that certain services, including preparation of advertising and promotional material, maintenance of various websites and electronic conversion of printed materials, were performed.

113. ECI, with the knowledge and participation of McNulty, knowingly and falsely represented that such services were performed by submitting approximately 74 fraudulent invoices to Fuji. ECI submitted these invoices with the intent to defraud and deceive Fuji so as to induce Fuji to make payments to ECI.

114. Fuji reasonably relied upon such material misrepresentations and was thereby induced to remit payment to ECI for these purported services.

115. Fuji had no knowledge of the falsity of McNulty's, Connell's and ECI's misrepresentations.

116. McNulty's, Connell's and ECI's conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

117. By reason of the foregoing, Fuji suffered actual damages in the amount of $2,000,000, together with interest, costs and attorneys' fees.

## SEVENTH CLAIM AGAINST McNULTY, CONNELL AND ECI

## FRAUD

118. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 117 above as if set forth in full herein. This claim is brought against defendants McNulty, Connell and ECI.

119. Between on or about December 2000 and on or about September 2003, ECI, with the knowledge and participation of McNulty, falsely and fraudulently and with the intent to defraud Fuji represented to Fuji that its fees for rebate fulfillment were at or below current market rates at that time.

120. ECI, with the knowledge and participation of McNulty, knowingly and falsely misrepresented that its rebate fulfillment fees were at or below market rates with the intent to defraud and deceive Fuji so as to induce Fuji to retain its services.

121. ECI, with the knowledge and participation of McNulty, knowingly inflated its invoices for rebate processing and submitted these invoices with the intent to defraud and deceive Fuji.

122. Fuji reasonably relied upon such material misrepresentations and was thereby induced to retain the services of ECI for rebate fulfillment and remit payment to ECI for these inflated invoices.

123. Fuji had no knowledge of the falsity of McNulty's, Connell's and ECI's misrepresentations.

124. McNulty's, Connell's and ECI's conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

125. By reason of the foregoing, Fuji suffered actual damages in the amount of approximately $1,800,000, together with interest, costs and attorneys' fees.

**EIGHTH CLAIM AGAINST McNULTY, FRANZE AND WINDWOOD**

**FRAUD**

126. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 125 above as if set forth in full herein. This claim is brought against defendants McNulty, Franze and Windwood.

127. Between on or about March 2003 and on or about April 2004, Windwood, with the knowledge and participation of McNulty, falsely and fraudulently and with the intent to defraud Fuji represented to Fuji that its fees for rebate fulfillment were at or below current market rates at that time.

128. Windwood, with the knowledge and participation of McNulty, knowingly and falsely misrepresented that its rebate fulfillment fees were at or below market rates with the intent to defraud and deceive Fuji so as to induce Fuji to retain its services.

129. Windwood, with the knowledge and participation of McNulty, knowingly inflated its invoices for rebate processing and submitted these invoices with the intent to defraud and deceive Fuji.

130. Fuji reasonably relied upon such material misrepresentations and was thereby induced to retain the services of Windwood for rebate fulfillment and remit payment to Windwood for these inflated invoices.

131. Fuji had no knowledge of the falsity of McNulty's, Franze's and Windwood's misrepresentations.

132. McNulty's, Franze's and Windwood's conduct in defrauding Fuji consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

133. By reason of the foregoing, Fuji suffered actual damages in the amount of approximately $1,600,000, together with interest, costs and attorneys' fees.

## NINTH CLAIM AGAINST ALL DEFENDANTS

## CONSPIRACY TO DEFRAUD

134. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 133 above as if set forth in full herein. This claim is brought against all defendants.

135. From in or about 1995 through in or about 2004, defendants knowingly and with the intent to defraud Fuji participated in a series of schemes that were devised and executed for the purpose of defrauding Fuji, all as specifically set forth in paragraphs 23 through 70 and 90 through 133 above.

136. In so doing, the conduct of the defendants consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

137. By reason of the foregoing, Fuji suffered damages in an amount not yet fully ascertained.

**TENTH CLAIM AGAINST McNULTY**

**BREACH OF FIDUCIARY DUTY**

138. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 137 above as if set forth in full herein. This claim is brought against defendant McNulty.

139. As an employee of Fuji and pursuant to signing the Acknowledgment, McNulty owed fiduciary duties to Fuji, including acting in good faith and in the best interests of Fuji and not competing with Fuji, profiting at Fuji's expense or placing McNulty's private interests in conflict with Fuji's interests.

140. During the period from in or about 1995 through in or about February 2004, McNulty repeatedly breached his fiduciary duties to Fuji, all as set forth above. McNulty did not act in good faith or in the best interests of Fuji when (i) he directed certain outside vendors to submit fictitious and/or inflated invoices to Fuji; (ii) he profited at Fuji's expense; and (iii) he placed his private interests, via his wife, AWOL and Revolutionary Graphics, in conflict with Fuji's interests. In so doing, McNulty's conduct consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

141. By reason of the foregoing, Fuji has been damaged in an amount not yet fully ascertained but believed to exceed $12,500,000, together with interest, costs and attorneys' fees.

**ELEVENTH CLAIM AGAINST L. McNULTY, a/k/a STRAUB, CONNELL, FRANZE, TAYLOR, ADK, AWOL, ECI, REVOLUTIONARY GRAPHICS AND WINDWOOD**

**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

142. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 141 above as if set forth in full herein. This claim is brought against defendants L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood.

143. McNulty breached the fiduciary obligations he owed to Fuji as alleged in paragraphs 138 through 141 above.

144. Defendants L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood knowingly induced and participated in McNulty's breach of his fiduciary obligations to Fuji. In so doing, the conduct of L. McNulty, a/k/a Straub, Connell, Franze, Taylor, ADK, AWOL, ECI, Revolutionary Graphics and Windwood consisted of gross, wanton and willful fraud and involved a high degree of moral culpability.

145. By reason of the foregoing, Fuji has been damaged in an amount not yet fully ascertained but believed to exceed $12,500,000, together with interest, costs and attorneys' fees.

**WHEREFORE**, Fuji demands judgment against the respective defendants named in the above claims as follows:

I. On the **FIRST** through **SECOND** claims awarding:

(a) damages in excess of $12,500,000, trebled;

(b) interest;

(c) attorneys' fees;

(d) the costs and disbursements of this action; and

(e) any such other and further relief as this Court may deem just and proper.

II. On the **THIRD** through **ELEVENTH** claims awarding:

(a) damages in excess of $12,500,000;

(b) interest;

(c) attorneys' fees;

(d) the costs and disbursements of this action; and

(e) any such other and further relief as this Court may deem just and proper.

III. On the **FIRST** through **ELEVENTH** claims awarding punitive damages against each defendant individually in an amount to be determined at trial.

Dated: New York, New York
September 9, 2005

Respectfully submitted,
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP

By: William O. Purcell
William O. Purcell (WP 5001)
Laryssa C. Kachmar (LK 4492)
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900

Attorneys for Plaintiff Fuji Photo
Film U.S.A., Inc.